We have four arguments on our docket this morning. We'll probably take a break at some point after the second or third case, but we can start now with 23-1306 McNellis v. Douglas County School District. Mr. Kontnick, is that right? You may begin. Okay. May it please the Court, when considering this appeal, there have been several claims that were set forth by the plaintiff, Corey McNellis, in this case. Fundamentally, though, there are three questions that the Court should evaluate when considering the merits of this appeal. First, whether it's plausible that Corey McNellis was speaking in his capacity as a father when he sent emails in response to the play about the Laramiere Project. Second, whether the school district intended to create a public forum by sending an initial email out to the entire Ponderosa community staff about the play. And third, whether it's plausible that the school district board terminated Mr. McNellis because of his emails related to the play. First, in Davis v. Utah, a panel of this Court held that speech generally falls outside of an official duties when the matter on which the employee speaks is not within the employee's assigned responsibilities or the employee has no duty to report the person or entity with whom the employee discusses the issue. Respectfully, there is no issue with respect to the duty to report. The issue in this case centers around the first problem, whether or not the employee is speaking within the employee's assigned responsibilities. In this case, we are fortunate because we have the actual emails that constitute the speech. So unlike having to address just the merits from the complaint, we can also look to Exhibit C to the motion to dismiss, which is the actual email that constitutes the protected speech in this case. When you look at the email, and this is up 137, the first thing that really stands out about the email is that it was an email from the theater director to the entire Ponderosa staff. And the title of the email is the Laramere Project, October 23-24, Letter from Ambassadors and Tickets. This is an email to the entire staff talking about a play that the theater teacher and the technical theater teacher had selected specifically the Laramere Project. Even though that was sent to all the employees, he had a special relationship to student activities because of a committee he belonged to. Is that correct? So he was part of the administrative team. And as part of the administrative team, he was responsible for executive functions in the school, but he was not responsible for producing the school play, selecting the school play, advertising the school play. As you can tell from this email, in fact, the school play had already been selected, and there was already an ambassador crew that had been selected that was responsible for doing public outreach to the Ponderosa community. Had that gone through his committee before then? Had there been any discussion of the play within that committee before the email sent to the staff? No, I do not believe so. That is not an issue that arises in the complaint. That is something that ended up coming up in the course of discovery. But Mr. McNariss really was commenting on the play based on the first impression that he got from this email, and that's actually evident in his response. Because if you look on F138, which is his first response to the email, he writes, thanks Kyra, I appreciate the email, and I really do admire the work that you do. As a dad of a student here, and also as an employee in the school, what is my recourse if I disagree with the production? Counsel, that's where I'm stuck. I'm trying to understand where our focus should be in analyzing your first issue. Is it that there's a disclaimer in his speech? He's saying, I'm speaking as a dad. Also as an employee, but as a dad. Is that disclaimer doing the work for purposes of your claim? Irrespective of what the subject matter is of the email? I guess I'm just trying to understand how much of a disclaimer is that? So I think the emphasis is critical that the court reads both this email, and then the email which occurs two pages, three pages later, on AB 141. And this is an email from Mr. McNariss, stating for the record, all of administration did not agree with me on this. I'm totally sober. I think the court needs to place a especially considering that this is a Rule 12 motion to dismiss, saying that the claim is not even plausible. Mr. McNariss here is stating that he is acting totally sober. He is not acting in his administrative function. He's not acting within the scope of his professional responsibilities. For the court to determine otherwise would be to reject the plain language of Mr. McNariss' email. And that would be highly problematic, because it's going to lead to an arbitrary decision-making process with respect to a First Amendment claim. Isn't it inevitable that the fact that prong one of Garcetti Pickering involves adjudication of this as a matter of law, that we have to take the and determine whether or not these emails from Mr. McNariss were either consistent with his job duties or not? And doesn't that, to some extent, obviate the ordinary emphasis on plausibility under 12b-6? So in this circumstance, I fundamentally centers around what his job responsibilities are. And that's why I think it's so critical to look at the merits of each individual case. The District Court relied on Boren, which is the case in the Fourth Circuit, where there was a dispute between a theater teacher and her boss, the administrator of the school, regarding which play that would be selected. In that case, it's where the theater director's core job responsibility was to select a play, promote the play, and put on the play. Here, we're looking at a very different type of situation, where Mr. McNariss was not responsible for producing the play or selecting the play. He was simply commenting on the play as a dad of the student, and admittedly, it's a controversial play. So I think in the context of taking the emails at face value and evaluating them, you have to look at the investigation that we're at and the purpose of the emails. The emails say what they say. That's not in dispute. The email was to all employees, so wasn't his response to that email pursuant to his duties as an employee of the school system, whether or not he was? So I think the crux of the analysis really needs to be, you know, looking at the emails and understanding in what capacity he was speaking. When you look at First Amendment claims, you need to analysis, like, the central analysis, whether you're relying on Davis, Bramah, Hawthorne, or any of the other cases that this court has decided, is that individual speaking in their public function, or are they speaking in their individual capacity? And I think, you know, to answer your question there, I think the crux here is really focused on this email was sent to all of the employees, and under Layton, the Supreme Court has said that it doesn't matter if they learn of the information through virtue of public employment. The question is really focused on a fact-by-fact case approach to figure out, is this speech related to something that happens, related to a public issue within his employment job responsibilities, or is it related to something outside of his job responsibilities? You're talking about a matter of public concern. It needs to be a matter of public concern. What is the matter of public concern here? Yeah, and I think when you look at the matter of public concern, you know, the email is just rife with all of the reasons that this is a matter of public concern. The school district was doing outreach to the entire Ponderosa community. They were advertising the show on the internet for anyone to consume via the internet. The email from the student ambassadors even notes that this is meant to be a discussion, not a battle. We want to bring to light perspectives, share human experiences, and start a conversation. So the whole email was designed to create a conversation about the play, and then Mr. McNellis responded to that email and generated a discussion, which included some of his own personal beliefs, but as a father of a student within that district, he certainly had the right to voice those beliefs. Well, are you not conflating the public character of the play itself with an individual's response to that outreach? In other words, let's assume that the play itself does entail a matter of public concern, a hate crime based on a sexual preference, but wasn't the intent that was laid out in the introductory email to inform all of the staff so that when they encounter questions, criticisms outside the school community, that people will be equipped to answer those questions. So I don't think it's very conflated in this context because the emails demonstrate that there is a matter of public concern with respect to the play itself, right? And so we'll assume that there is a matter of public concern there, but then Mr. McNellis specifically talks about how he wants to work to collaborate with them to provide a Christian perspective to the play, and you know, if you don't know the Laramare Project, it's a pretty politically charged play that does not depict Christianity in the best light, and that is certainly something that is a public concern to Mr. McNellis or really any other family with students in that district who practice Christianity and believe in that faith. I think before reserving the rest of my time for rebuttal, I think it's important to note the school district's response and they've essentially argued on appeal that they cannot be held liable because they cannot be bound through the theory of respondents superior. That sort of is the mark in this case. In this case, we have pled allegations that the defendant specifically told McNellis that he was terminated because of the Laramare Project emails. We also have a letter from the former principal stating that the decision to terminate him was essentially out of the principal's hands. We also made allegations that David Ray, a member of the board, was aware of the decision to suspend him because of the emails and investigate him because of the emails. The decision to terminate him, the board's decision to terminate him, flowed directly from that. At this stage of the litigation, without having had the opportunity to depose the board or conduct evidence, that's about as good as evidence as you could hope to have to demonstrate that the board's subjective intent was to terminate him based on the emails. At this time, I would like to reserve the remaining minute of my time for rebuttal and thank you. Counsel? Thank you, Judge Harts and may it please the court. If you take a practical view of the allegations in this case, the ultimate question is whether the clear that the answer is that they were. Doesn't your argument require us to read the email a little differently than what it says? It sort of requires us not to think about how he cabined his own message, that he was speaking not just as an employee, but I'm speaking as a dad. How do you account for that and prevail? Well, we're asking you read the entire email, not just the part that says as a dad of a student here, and also as an employee in the school. Those have to be read together and that's what I'm asking. We're certainly not suggesting we're gonna pick and choose from the emails, but how do we read it holistically with that language in it? I think you read it exactly like that and as a whole, but then you say, well what if there's some overlap? Can someone speak in a employment and in a private capacity at the same time? That's certainly possible. We're not arguing that that can't happen, but the issue is what do you do when there's that overlap? Well, we know from Garcetti that once the employee speaks as an employee, the potential for overlap I think is completely immaterial and irrelevant. It can't override or swallow or obviate the employee's speech in their employment capacity. Can I follow up on that? You know, we are looking at this under 12b-6, right? Absolutely. And so we do construe the allegations of the complaint favorably to Mr. McNellis, correct? Yes. And on appendix 138 in the email itself, can't we ascertain three things? One, he refers to himself as Judge Rossman indicated, as a dad of a student. Number two, as an employee of the school like every other recipient of the email, not as an administrator. And three, curiously, he doesn't use his authority as the assistant principal, but he asks the play director what his if his response is exercising his authority as the assistant principal. Putting those three things together with the gloss of 12b-6, can't we reasonably construe the allegations to indicate that he was acting in his private capacity? Well, I disagree, your honor, and a few points to that. First of all, I agree with number one. I mean, he says we just talked about that, right? Read the whole email and exactly what he says. And both, he's saying a dad and as an employee. Number two, I don't think, though, that you could say that he was saying employee only and not as an administrator. Look at the email signature block that he has on there. I mean, you know, you can delete your email signature block if you want to in an email. Some people do. He didn't do that here. He left it in there. And what does it say? Athletic director slash assistant principal. So he put that on his signature. So to say, oh, he's just saying employee, I don't think that that's fair. I think you have to read the signature block with his words as well. And then, does he not use his authority? Well, I mean, that's an interesting question, and I don't know if we can definitively say at the pleading stage, but at this point, I think I would make clear, because you asked this question earlier, I don't think that we're relying on the plausibility standard for this argument. And that is because, you know, you have to make a question, a termination of district court did. So as you said before, we know what the allegations are. They're not in dispute. You read the email, but you also have to look at the full context of everything else, right? His position, what were his duties at that time as alleged in the complaint? Are you conceding that if he wasn't writing that pursuant to his authority, but just pursuant to his duty, that Garcetti would not bar the claim? No, I'm not conceding that. I don't think that's the test. I just think it was an interesting characterization to question if someone is springing forth from their authority, but that isn't really the test. I mean, what we know the test is, is did the employee do something that they were paid to do? Was it within the scope of their duties, right? Did it further their duties in some way? And I mean, sure, you have to look at the intent of the speaker to the extent you can, and you look at all the different cases, but that isn't to say that that one is dispositive over others. No, I don't think that that's right, and I don't think that's quite the right formulation of the test either. Let's look at all of everything that we have here. So in the second email, well, first of all, I just want to close on the first point, which is you have an employee here who says, I recognize as a speaker that I'm speaking, at least in part, as an employee. I don't know how you can reasonably conclude that that doesn't fall within Garcetti Pickering when the employee characterizes it that way. I'm sorry. So, but the email was addressing all of the staff, all of the emails. So if the sanitation worker were responding and saying, you know, as an employee of the school, you're saying that why would that indicate that he or she is acting in his official as opposed to personal capacity? He doesn't say as the assistant principal. He says that as an employee of the school, and then he asks the question, you know, what is my recourse if I disagree, which would put him in the same position as every other recipient of the email. Right, and one of those recipients, keep in mind, were fellow administrators of the school, including his boss, the principal of the school. So, I mean, it's an assumption to say that that question that Mr. McNellis wrote was solely focused on Ms. Diaz, the sender of the original email, could very well have been intended to reach to his boss, the principal as well, and say, hey, what are we doing about this? What can we do about this? I don't like this play. I don't think this play should be happening here, and is this it? Right, I mean, and here's my signature. I'm an instructor. I have responsibility and a say in extracurricular activities. Is this it? So, and what about the next question? Was this a heads-up to see if everyone is cool? Do you think that Mr. McNellis was asking the principal if somebody else's email was to see if everyone is cool? He's obviously referring to Kayla. Right, and I think what he's saying there is saying, has this been cleared by somebody else above my, above me, or someone else? Because he's saying, I guess he's fair inference to say, as Mr. Kottnick suggests, that we, you know, it's not a list here, but he didn't know, right? He didn't know the play was was selected at that point in time. Yeah, but again, look, he chose to say. What if he had only said he was speaking as a dad? Everything else is the same. Would you? I mean, certainly that would be a major difference in the facts here. I still think you'd have to look at all the other other factors, and that we know, which is, he chose to send the email through his work email. He chose to keep his signature block on there, and whether you like it or not, a school administrator can't necessarily take off that hat to their subordinates so easily, who are all on this email chain. And so, if he really wanted to speak as a dad, is it enough as you put it, Judge Rogman, put a put a disclaimer? I mean, you know, again, I already addressed that as a legal matter, but just in terms of practically, why not log off your work email and send an email from your, from your personal email to that, to that teacher Diaz, or to the principal of the school, and say, I'm concerned about this, I'm separate from my work, right? He could have done all of that, but he didn't do that, and that's an important factor here. Assuming he hid a private email. Assuming he did have one? Yeah. Oh, well, okay. I mean, I don't have a private email, so every email comes from my, that I send, comes from my work address. Sure. Well, if, if he wanted to have one, he could have one. It takes, you know, less than a minute or something to set up a Google, whatever. You're making all of these very fact-specific arguments, constroying the allegations and the complaint favorably to the defendant, not the plaintiff. You're assuming a lot of things. You're assuming he has a private email, that he could have done that. You're assuming that these two questions that began addressing Kayla, or actually to the principal, aren't you construing all of the allegations of the complaint favorably to the defendant, rather than the plaintiff? Well, I'm just trying to answer the questions here today, and think about this as deeply as we can, but again, I'm not riding the plausibility standard here. Let's stick with the allegations and the complaint, take them as true, put them all together, and we have, we have a situation where someone is, clearly thinks they are speaking as an employee, and all these other circumstances about it lead to that conclusion. I think the district court was right, and you can review that as a question of law, de novo, and reach the same, and you ought to reach the same conclusion. A couple points I want to make as my time's running. Before you run out of time, there's another claim here that we're discrimination. How can you defend that claim? Well, first of all, I think the first question is, does he allege direct evidence of discrimination? And the only allegation in the complaint that it comes anywhere close to that, is that the defendant, again doesn't say who, right, just says the defendant, which is the institution, cited emails, his emails, as the reason for termination. But that is in and of itself is not direct evidence of religious discrimination. I mean, I really don't have a problem on the basis of the allegations in the complaint inferring that there is a religious discriminatory motive here. The timing was remarkable, the statements he quotes from people, including the principal after he left. Are you resting your defense on the inadequacy of the religious discrimination? Not entirely, no. I mean, that's just one point. I mean, what other defense do you have? Well, his theory was disparate treatment, right, and that was his theory that he presented. I would just say temporal proximity is argued in the briefs for the first time. That was not presented below, so whether you want to choose to entertain that or not, it's up to you. I don't think you... It wasn't like he's relying on facts outside the argument was never presented below. It wasn't briefed in the motion to dismiss. Okay. It's a new argument on appeal and you ought to consider that. But in terms of that, I mean, his theory was not... I mean, his whole theory was other people were implicated in this investigation and nothing happened to them. So that's fine. That disparate treatment is certainly a theory of religious discrimination or other types of discrimination, but it depends on the protected classification and he doesn't have any allegations whatsoever about what religious beliefs those employees had or, and this goes again to the proximity piece, whether that's the theory either, what religious beliefs did the actual decision-makers here have? Why else would they fire him for those emails? Well, as the district... What other motive could there be here? As the district said, this is unprofessional conduct and they do an investigation and in the course of an investigation, as alleged, other issues arose. Issues about COVID compliance, issues about a good old boys club at the school. So, and Mr. McNellis, I mean, that's what we have to go on from the complaint. At the end of it, he's terminated. So, you know, you... Those sounds like, those sound like things that could be his claim is valid or not. Sure. But at the motion to dismiss stage... Sure. I mean, they're very thin allegations, but the point of it being, a defendant shouldn't have to stand for discovery on something that's just conceivable, a conceivable theory of religious discrimination. It has to be plausible and that has to mean something. He hasn't alleged who the decision-makers were. It just, it just reeks of religious discrimination to me. That may not be accurate when we get all the facts. Well, this is, you know... All he had to allege was that the decision, who the decision-maker was and the decision-maker had a religious animus towards evangelical Christians. Doesn't he need discovery to find out exactly how that process worked? And if people involved in the decision-making had a religious animus, then he's got a cat's-paw argument. Even if the ultimate decision was by the board, we don't know if the board was deferential to the principal. With respect, I think he can allege much more. He worked there for, what did he say in here, I may have the year wrong, but over a decade, 17 some years in the district. He identified the people who were involved in the investigation part of the process and then he suddenly doesn't identify who told him he was terminated or even really clearly state what they said the reasons for the termination were. I mean, this is very careful, artful pleading to and, you know, that's not, doesn't state a plausible claim and now a school district public entity has to stand for discovery on that. I don't think that's enough and that district court felt so too and that's our point. Okay, thank you All right, we would ask that you affirm the ruling. Thank you. You have one more minute, a little over a minute. Okay, I think there's two fundamental things that the court needs to hone in on here. First, we're evaluating whether or not the complaint simply makes sufficient allegations to discrimination on the basis of free speech. One thing we usually require is identifying the person who said something. Why couldn't you identify the people who admitted the religious motive? Yeah, so, I mean, looking back on it, I really wish I had identified the specific individual who told him that they were terminating him because of the emails. That is not something that was specifically enumerated in the complaint, but we did allege that the defendant told him that he was terminated. Well, the defendant is the school district. Correct, the defendant is the school district. Shouldn't you have alleged who it was who actually said that? That's a real omission. Yeah, I mean, looking back, I definitely should have, but in terms of assessing the complaint under Rule 12b6 to assess the adequacy of the complaint to determine whether or not this is an issue that should be permitted upon discovery, I think the allegations are certainly adequate in that regard. Let me follow up. Did the motion to dismiss recite that you had not alleged who said this, and if so, why didn't you request an admission? Yeah, so I think that's really based on the procedural, the procedure in terms of the timing of the order on the motion to dismiss. So we filed an initial complaint. The defendant then filed a motion to dismiss, and then we filed an amended complaint, and then I think it was maybe seven months later, ballpark, something I thought about a week or two before the close of the court just ruled on the motion to dismiss. So at that point, given how far along that we were into the case, given that discovery was mostly completed, and given just, you know, honestly the nature of the order, you know, we thought the best process was to just proceed with an appeal. Thank you. Time is expired. Case is submitted. Counselor excused.